[937 NYS2d 203]

In the Matter of STATE OF NEW YORK, Appellant, v ENRIQUE T., Respondent.

First Department, January 26, 2012

APPEARANCES OF COUNSEL

*Eric T. Schneiderman, Attorney General*, New York City (*Patrick J. Walsh* and *Steven C. Wu* of counsel), for appellant.

*Marvin Bernstein, Mental Hygiene Legal Service*, New York City (*Sadie Zea Ishee* of counsel), for respondent.

## OPINION OF THE COURT

CATTERSON, J.

In this proceeding in which the New York State Attorney General seeks civil management of a sex offender pursuant to article 10 of the Mental Hygiene Law, we are asked to vacate an order of Supreme Court that unconditionally released the respondent, a convicted sex offender. His release was based on a finding that the pretrial civil detention provisions mandated by Mental Hygiene Law § 10.06 (k) are facially unconstitutional. This Court now finds that Supreme Court erred in attempting to make such a determination. We therefore reverse, on the law, vacate the order of the respondent's unconditional release, and order the respondent returned to detention pending completion of disposition pursuant to the Sex Offender Management and Treatment Act (hereinafter referred to as SOMTA).[1] Addition-

---

1. This Court was informed at oral argument on December 15, 2011 that at trial, the respondent was found to be a sex offender requiring civil management, and that a dispositional hearing was set for January 30, 2012. Pending disposition, the court continued the respondent's unconditional release.

ally, we reject the respondent's argument on appeal that the statute is unconstitutional as applied to him and those sex offenders who may ultimately be approved for civil management under strict and intensive supervision and treatment, a less restrictive alternative to confinement.

The respondent, Enrique T., is a 36-year-old convicted sex offender whose first conviction for a sexual offense occurred in 1990 when he raped and sodomized a four-year-old girl whom his mother was babysitting. He pleaded guilty to rape in the first degree and was sentenced to a prison term of 1 to 3 years.

On January 23, 2001, the respondent was arrested and charged with multiple counts of deviate sexual intercourse with a person under age 11, sodomy and sexual abuse. He pleaded guilty to two counts of sexual abuse in the first degree involving sexual contact with his girlfriend's seven-year-old daughter and forcing an 11-year-old girl to undress and allow him to fondle her breasts and vagina. The 2001 rape and sodomy came to light when the younger victim told her mother that she knew about sex because the respondent had forced her into numerous sexual activities, including putting his penis in her mouth and forcing it into her rectum. An investigation determined that between July 1, 2000 and August 31, 2000, the respondent subjected the victim to numerous forms of sexual contact against her will; during the same period, on at least three occasions, he forced a second child to undress and fondled her breasts and vaginal area. In subsequent sex offender counseling, the respondent admitted to the activity, and said he "groomed" the victims by buying them things and that he "fantasized" about them getting naked and in sexual positions; he said his "excuse" was that the older victim was a "big boned girl" who was "ready for sex" and the younger one was "getting there too so it's ok for her too." He was sentenced on March 2, 2001 to a term of five years to be followed by five years' postrelease supervision.

After the respondent was released to parole supervision on June 17, 2005, he absconded to Florida and tampered with his electronic monitoring unit, resulting in his parole being revoked on August 15, 2006. The respondent was returned to custody to complete his sentence. The respondent's scheduled release date of January 23, 2011 brought him within the purview of article 10 in October 2010.

Article 10 forms the basis of SOMTA, enacted by the Legislature, effective April 13, 2007. The statute was based on legislative findings "[t]hat some sex offenders have mental abnormali-

ties that predispose them to engage in repeated sex offenses." (Mental Hygiene Law § 10.01 [b].) The Legislature's concern was that "recidivistic sex offenders pose a danger to society that should be addressed through comprehensive programs of treatment and management." (Mental Hygiene Law § 10.01 [a].) "Civil management" means either commitment to a secure psychiatric facility, or management in the community under the supervision of the Department of Corrections and Community Supervision. The second option is known as strict and intensive supervision and treatment (hereinafter referred to as SIST). (Mental Hygiene Law § 10.03 [q]; § 10.11 [a] [2].)

When a detained sex offender is nearing release, the agency with jurisdiction over the offender is required to give notice of the anticipated release to the Attorney General and the Commissioner of Mental Health. (Mental Hygiene Law § 10.05 [b].) The Commissioner is authorized to designate a multidisciplinary staff that will make a "preliminary review" of the need for civil management and whether to refer the person to a case review team. (Mental Hygiene Law § 10.05 [d].)

If the preliminary review results in referral to a case review team, the team must review relevant medical and other records, and may arrange for a psychiatric examination. (Mental Hygiene Law § 10.05 [e].) If the case review team finds that a respondent is a sex offender requiring civil management, it must notify the respondent and the Attorney General. (Mental Hygiene Law § 10.05 [g].) The Attorney General then may file a sex offender civil management petition. (Mental Hygiene Law § 10.06 [a].)

Within 30 days after the filing of a civil management petition, the court is required to conduct a hearing without a jury to "determine whether there is probable cause to believe that the respondent is a sex offender requiring civil management." (Mental Hygiene Law § 10.06 [g].) If the court finds "there is probable cause to believe that the respondent is a sex offender requiring civil management," it must order that the respondent be committed to a secure treatment facility designated by the Office of Mental Health (hereinafter referred to as OMH) for care, treatment and control. (Mental Hygiene Law § 10.06 [k].) The court is also required to set a date for a jury trial, to be conducted within 60 days after the probable cause determination, and "the respondent shall not be released pending the completion of such trial." (Id.; Mental Hygiene Law § 10.07 [a].)

Subsequently, if, at trial, a jury finds that the respondent is a sex offender suffering from a mental abnormality, then the court

determines the appropriate disposition at a hearing. It "shall consider whether the respondent is a dangerous sex offender requiring confinement or a sex offender requiring strict and intensive supervision." (Mental Hygiene Law § 10.07 [f].) Additional evidence may be offered on that issue by both the respondent and the Attorney General. (Mental Hygiene Law § 10.07 [f].)

Civil commitment to a secure treatment facility is required if the court finds, upon clear and convincing evidence, that the respondent "has a mental abnormality involving such a strong predisposition to commit sex offenses, and such an inability to control behavior, that the respondent is likely to be a danger to others and to commit sex offenses if not confined to a secure treatment facility." (Mental Hygiene Law § 10.07 [f].) If the court does not so find, it *must* make a finding of disposition that the respondent is a sex offender requiring SIST. (Mental Hygiene Law § 10.07 [f].) The determination is based on consideration of the conditions that would be imposed under SIST, and all available information about the prospects for the respondent's reentry into the community. (*Id.*)

In this case, on October 28, 2010, the Department of Corrections and Community Supervision (hereinafter referred to as DOCCS) gave notice to the Commissioner and the Attorney General pursuant to Mental Hygiene Law § 10.05 (b) of the respondent's anticipated release from incarceration on January 23, 2011. On November 22, 2010, it gave notice to the respondent that his case had been referred to a case review team for evaluation. On January 13, 2011, OMH notified the respondent that the case review team had found he was a sex offender requiring civil management, and provided him with a copy of a report prepared by an OMH psychologist. On January 14, 2011, the Attorney General filed a petition pursuant to article 10, seeking civil management of the respondent following his release from prison. Following the filing of the petition, the Attorney General moved for an order finding probable cause to believe the respondent is a sex offender requiring civil management. The court set a January 20, 2011 return date, appointed Mental Hygiene Legal Service as counsel, and authorized retention of the respondent pending the probable cause hearing.

The Attorney General submitted an evaluation report prepared by an OMH psychologist, dated January 11, 2011. Based on an interview of the respondent, review of his criminal history and records of DOCCS and the State Division of Parole, the

OMH psychologist concluded that the respondent has a mental abnormality as defined by Mental Hygiene Law § 10.03 (i), and that he meets diagnostic criteria for pedophilia and antisocial personality disorder. The Attorney General reported that the respondent had scored a 5 on the STATIC-99 instrument, which predicts the risk of recidivism for sexual offenders, indicating a moderate to high risk. The Attorney General urged that, given the respondent's criminal record and history of having absconded from parole, he is a "detained sex offender who requires civil management," and that he is "sufficiently dangerous" to require pretrial detention and no less restrictive alternative to OMH confinement would adequately protect the public pending trial.[2]

On or about May 26, 2011, the OMH psychologist testified at the respondent's probable cause hearing. The psychologist opined that the respondent had retained a deviant sexual arousal to young girls, or chronic pedophilia, and antisocial personality disorder, and that he suffers from a mental abnormality with serious difficulties in controlling such conduct. According to the psychologist, the respondent's language and repeated behavior indicated that he is still suffering from a disorder. The psychologist stated that she considered the respondent to be a danger to the community if released pending trial, absent information on where he would reside and go for treatment.

The court's written decision of June 7, 2011 was based on what it deemed to be the psychologist's "credible" testimony that the respondent suffers from conditions that "predispose him to commit sex offenses." (31 Misc 3d 1237[A], 2011 NY Slip Op 51027[U], *5, *6 [2011].) Additionally, the court found the respondent dangerous based on testimony that he had violated his parole and had serious difficulty controlling his behavior; the "chronic nature of his deviant sexual interest[ ]" in young girls; and his "willingness to risk his personal, familial relationships to satisfy his sexual urges." (*Id.* at *6, *7.)

However, the court stated it would continue the hearing on the issue of whether the respondent could be civilly confined pending trial in light of a federal injunction barring the Attorney General from seeking enforcement of the mandatory detention provisions of Mental Hygiene Law § 10.06 (k). On

---

**2.** The Attorney General was bound by a federal injunction barring him from enforcing mandatory pretrial detention without showing that no lesser conditions than confinement will suffice.

June 13, 2011, the court reopened the probable cause hearing based on the federal decision in *Mental Hygiene Legal Serv. v Cuomo* (785 F Supp 2d 205 [SD NY 2011]), which the court acknowledged was not binding, but which it found "persuasive." After hearing arguments, the court issued an order for an investigation as to the propriety of civil management by SIST for the respondent, and adjourned the matter to August 1, 2011 for receipt of the report.

The SIST report, completed by DOCCS and OMH on July 14, 2011, recommended 69 mandatory and special conditions of SIST that would apply to the respondent. The OMH report found the respondent "has demonstrated his sexually deviant and unpredictable behavior, as well as behavior that places the community at risk," and, if released, he "will be monitored closely and placed on a curfew" and electronic monitoring. The community investigation by DOCCS concluded that it would approve proposed release to a supervised program and to a single room occupancy residence, and that the respondent would be required to register pursuant to the Sex Offender Registration Act as a level three sex offender.

In a supplemental decision dated August 4, 2011, the court concluded that Mental Hygiene Law § 10.06 (k), the pretrial detention provision of article 10, is facially unconstitutional, and that it was therefore constrained to order the respondent's release. The court purported to find facial unconstitutionality based on its observation that the provision mandates pretrial detention "without any delineation between a dangerous sex offender requiring confinement and a sex offender requiring strict and intensive supervision." (34 Misc 3d 319, 321-322 [2011] [internal quotation marks omitted].) The court appeared to draw, in part, on *Mental Hygiene Legal Serv. v Cuomo*, where the District Court held that there are those with a mental abnormality who will be subject to detention, and those with a mental abnormality subject to parole- or probation-like conditions, but that the provision at issue provides for automatic detention of all article 10 individuals "without a judicial proceeding to determine dangerousness." (785 F Supp 2d at 226.)

The court further noted that OMH had recommended community-based treatment for the respondent after trial, demonstrating that "[t]here is very little likelihood, if any," that he would ultimately be found to be a "dangerous sex offender requiring confinement." (34 Misc 3d at 346.) Thus, the court

observed, the pretrial detention imposed on the respondent was "more onerous than the consequences that [he] faces even if a jury were to find, after a trial, that he suffers from a mental abnormality." (*Id.*)

The court, relying on *United States v Salerno* (481 US 739 [1987]), concluded that due process mandates a "specific finding of dangerousness" and a showing that "lesser conditions than confinement would not suffice to protect the community." (34 Misc 3d at 321.) It observed that the Attorney General had failed in its burden to make such a showing, but that, in this case, no such finding could be made anyway as the SIST report made clear that the respondent could be safely released to the community under supervision.

Additionally, the court observed that article 10 violates procedural due process because the statute provides no means "to effectuate any finding by a court that lesser conditions than confinement (e.g., supervision, medication, community-based treatment) would suffice to protect the community from a respondent pending a civil management trial." (34 Misc 3d at 322.)

On appeal, the Attorney General asserts that Supreme Court erred because Mental Hygiene Law § 10.06 (k) incorporates a finding of dangerousness at the probable cause stage, release under SIST represents a discretionary policy and is not constitutionally mandated, and the United States Supreme Court has upheld civil commitment statutes without a consideration of less restrictive alternatives where a respondent is found to be a danger to society. Thus, the Attorney General argues, committing the respondent to a secure treatment facility pending trial does not violate any substantive or procedural due process guarantees, even if it is ultimately found, after trial, that he requires civil management under SIST.

For the reasons set forth below, we hold that a finding of probable cause to believe that an article 10 sex offender requires civil management because of mental abnormality incorporates the necessary finding of a respondent's dangerousness. As a danger to society, all article 10 sex offenders, therefore, come within the scope of those statutes upheld by the United States Supreme Court that authorize commitment or detention, even pretrial detention, without mandating consideration of a lesser restrictive alternative.

Therefore, the fact that under article 10, a court is subsequently required to determine whether civil management should

continue at a secure treatment facility or should take the less restrictive form of SIST is a discretionary policy. Furthermore, release under SIST is not, as characterized by the federal district court in *Cuomo*, a "parole- or probation-like" (785 F Supp 2d at 222) release but is a complex and individualized plan, primarily meant to safeguard the community into which the sex offender will be released. It is thus not an alternative available at the probable cause stage of the judicial process which determines whether there is reasonable cause to believe that a detained sex offender has a mental abnormality rendering him a danger to society.

■ Initially, Supreme Court erred in attempting to determine, sua sponte, the facial validity of Mental Hygiene Law § 10.06 (k). The issue of facial unconstitutionality was not before the court, the respondent did not argue it, and in any such argument, it is the challenger's burden to so argue and establish unconstitutionality beyond a reasonable doubt. (*Cook v City of Binghamton*, 48 NY2d 323, 330 [1979] ["(t)he burden of showing the unconstitutionality of a statute, (of) course, rests on the party which attacks its validity and every legislative enactment carries a strong presumption of constitutionality" (citations omitted)].) Facial invalidation is an extraordinary remedy and generally is disfavored. (*Amazon.com, LLC v New York State Dept. of Taxation & Fin.*, 81 AD3d 183, 194 [1st Dept 2010].) Moreover, it is well settled that " 'courts *must* avoid, if possible, interpreting a presumptively valid statute in a way that will needlessly render it unconstitutional.' " (*Id.* [emphasis added], quoting *LaValle v Hayden*, 98 NY2d 155, 161 [2002]; *see also Washington State Grange v Washington State Republican Party*, 552 US 442, 450 [2008] [acknowledging courts' general reluctance to " 'formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied' "].)

Thus, the court erred in embarking on such an analysis, sua sponte, and we decline to compound the error by making any determination on the merits, save to observe that the court's decision clearly missed the mark on facial invalidation: The heavy burden of a challenger is to establish that "no set of circumstances exists under which the [statute] would be valid." (*Salerno*, 481 US at 745.)

This the court did not do. Rather, the court appeared to accept that there is a category of article 10 sex offenders where pretrial detention would be valid, but observed that this was not applicable to the respondent, who appeared to fall into that

category of sex offender who could be approved posttrial for supervision rather than commitment. The court held: "[t]his is just such a case where less restrictive conditions would suffice to protect the public *during the pendency of respondent's trial.*" (34 Misc 3d at 322 [emphasis added].)

On appeal, the respondent does not assert more. He argues, inter alia, that Mental Hygiene Law § 10.06 (k)'s mandatory detention provision is unconstitutional *as applied* to him because he belongs to that class of sex offender that may ultimately be found suitable for SIST, that the evidence before the hearing court indicated that he could be "safely" released on conditions pending trial, and thus that the Attorney General failed in sustaining its burden of proving that less restrictive alternatives would not suffice to protect the community from him. Therefore, the respondent argues, the provision offends the due process guarantees of the Federal Constitution, and violates the New York State Constitution's guarantee that mental health patients be treated in the "least restrictive alternative setting."

We confine our analysis to the respondent's assertion that the statute is unconstitutional as applied to him as well as to that category of article 10 sex offenders who, at disposition, may be approved for release into the community under SIST. The respondent argues that if he and others like him are found not sufficiently dangerous to warrant confinement posttrial and disposition, then they are not sufficiently dangerous to warrant detention pretrial. Thus, he asserts, the provision is not narrowly tailored to effectuate the government's objective of protecting the public from him and those like him. We disagree.

Any view that there are dangerous and nondangerous article 10 sex offenders, or that there is no judicial determination of dangerousness at the probable cause stage is based on an essential misreading of the statute. The statute is clear that a " '[s]ex offender requiring civil management' means a detained sex offender who suffers from a mental abnormality." (Mental Hygiene Law § 10.03 [q].) "Mental abnormality," in turn, means: "a congenital or acquired condition, disease or disorder that affects the emotional, cognitive, or volitional capacity of a person in a manner that predisposes him or her to the commission of conduct constituting a sex offense and that results in that person having serious difficulty in controlling such conduct." (Mental Hygiene Law § 10.03 [i].)

These component elements of mental abnormality hew closely to the statutory language analyzed in *Kansas v Hendricks* (521

US 346 [1997]), which the United States Supreme Court held was sufficient to establish a finding of dangerousness based on a mental abnormality characterized by a "serious lack of ability to control behavior." (*Kansas v Crane*, 534 US 407, 413 [2002].) Thus, article 10's definition of mental abnormality incorporates a finding of a respondent's dangerousness, even if the word "dangerous" is not used in the statutory definition. (*See Matter of David B.*, 97 NY2d 267, 275-276 [2002]; *see also Kansas v Crane*, 534 US at 413 ["(s)tates retain considerable leeway in defining the mental abnormalities and personality disorders that make an individual eligible for commitment"].)

Consequently, whether ultimately confined or released conditionally under SIST, all article 10 sex offenders are "detained sex offender[s]" where there is probable cause to believe they suffer a mental abnormality, and where such is found at trial. (Mental Hygiene Law § 10.03 [q]; *see also* § 10.03 [r] [" '(s)ex offender requiring strict and intensive supervision' means a detained sex offender who suffers from a mental abnormality"]; § 10.03 [e] [" '(d)angerous sex offender requiring confinement' means a person who is a detained sex offender suffering from a mental abnormality"].)

The fact that a sex offender requiring SIST is defined as "a detained sex offender who suffers from a mental abnormality but is not a dangerous sex offender requiring confinement" (Mental Hygiene Law § 10.03 [r]) is not to be interpreted to mean a sex offender who is *not* dangerous at all. Rather, it should be interpreted to mean a sex offender who is not dangerous to the extent where his dangerousness must be managed by confinement. Indeed, article 10's procedures are designed to winnow out the *most* dangerous of the dangerous sex offenders where "confinement . . . will need to be extended by civil process." (Mental Hygiene Law § 10.01 [b].)

More significantly, the requirements of due process are met in providing for the civil commitment of sexual predators based on a "finding of dangerousness" resulting from a mental illness or mental abnormality that results in a "serious lack of ability to control behavior." (*Crane*, 534 US at 409-410, 412-413 [internal quotation marks omitted]; *see also Hendricks*, 521 US at 357 [states may provide for civil detainment of people "who are unable to control their behavior and *who thereby pose a danger* to the public health and safety" (emphasis added)].)

Thus, as the Attorney General correctly asserts, article 10's scope encompasses only sex offenders who are dangerous enough

to be confined without the need to consider less restrictive alternatives. (*See Hendricks,* 521 US at 387 [Breyer, J., dissenting] [criticizing Kansas statute for not considering lesser conditions of release for dangerous sexual predators].)

We therefore reject the argument, accepted by the court below, that the State may impose pretrial detention only if it shows there are no lesser conditions than confinement to assure the safety of the community. The respondent, relying on *United States v Salerno,* argues that the Supreme Court has never upheld pretrial detention unless the statute authorizing that detention included some individual inquiry to ensure that pretrial detention was imposed only on those individuals who could not be managed in less restrictive ways. This is simply incorrect. *Salerno* does not stand for the proposition that consideration of the least restrictive alternative is constitutionally mandated at the pretrial detention stage.

In *Salerno,* the Supreme Court determined the constitutionality of a federal statute, the 1984 Bail Reform Act, authorizing postarrest/pretrial detention of individuals *charged* under penal law with a specific category of "extremely serious offenses" on the grounds that it was likely they would be responsible for dangerous acts in the community after arrest. (*Salerno,* 481 US at 750.) The challenge implicated the inviolate constitutional principle of presumption of innocence. Indeed, the dissent framed the issue as determining the constitutionality of

> "a statute in which Congress declares that a person innocent of any crime may be jailed indefinitely, pending the trial of allegations which are legally presumed to be untrue, if the Government shows to the satisfaction of a judge that the accused is likely to commit crimes, unrelated to the pending charges, at any time in the future." (*Salerno,* 481 US at 755 [Marshall, J., dissenting].)

The majority, thus, articulated a number of factors that were to be considered by courts in order to ensure that the act was consistent with due process. The "no lesser conditions" analysis was just one of the factors, but *Salerno* did not mandate a "lesser conditions" analysis as a fundamental constitutional requirement for all pretrial detention or confinement.

Further, the statute challenged in *Salerno* is easily distinguishable from the provision at issue here, since article 10 contemplates further civil management for a *convicted* and *detained* sex offender based on a probable cause finding that the

sex offender is a danger to society because of his predisposition to commit sex offenses. Such civil management usually follows a sentence imposed for a criminal sex offense. Hence, the future dangerousness of article 10 sex offenders is closely related to the crime of which they have been convicted, and for which they have been incarcerated.

In any event, the Supreme Court has consistently held that government's "regulatory interest in community safety can, in appropriate circumstances, outweigh an individual's liberty interest." (*Salerno*, 481 US at 748-749 [authority of government is well established, in special circumstances, to restrain an individual's liberty prior to, or even without, criminal trial and conviction].) The question for a court to determine is whether the restriction of liberty is "impermissible punishment or permissible regulation." (*Id.* at 747.)

The Supreme Court was particularly instructive in *Schall v Martin* (467 US 253 [1984]) as to a situation where a final disposition may be less onerous than pretrial detention. The statute at issue in *Schall* concerned juveniles detained before trial, who ultimately could demonstrate that detention posttrial is unnecessary. The Court held that "the final disposition of a case is largely irrelevant to the legality of a pretrial detention." (467 US at 273 [internal quotation marks omitted].) More interestingly, the Court cited to the New York Court of Appeals' observation that "caution and concern for both the [respondent] and society may indicate the more conservative decision to detain at the very outset, whereas *the later development of very much more relevant information* may prove that while a finding of delinquency was warranted, placement may not be indicated." (*Id.*, quoting *People ex rel. Wayburn v Schupf*, 39 NY2d 682, 690 [1976].)

As the Attorney General persuasively asserts, the Legislature's decision to provide, as a discretionary policy, the less restrictive option of SIST to certain dangerous respondents after trial depends on implementing a carefully tailored and individualized program. (Mental Hygiene Law § 10.11 [a].) This does not create a mandatory constitutional obligation to offer such release before trial when the same safeguards and protections are absent. The court below appeared to misapprehend the nature of SIST as a lesser restrictive alternative. Certainly, contrary to the Federal District Court's characterization of SIST as a "parole- or probation-like" alternative, SIST is a uniquely restrictive program or "substantially" more restrictive than parole or probation.

The recommendation for the respondent specified 69 mandatory restrictions and special conditions. These included: submission to physical inspection and search by parole officers *whenever directed* and random alcohol and drug testing; requirement of making a log of all daily events; obligation to submit television, phone, Internet and cable bills upon request; prohibition from leaving the state, entering school grounds, using on-line computer services that exchange electronic messages, and watching sexually explicit movies; prohibition from using a computer without permission, contact with children under age 18 unless approved by a parole officer, and ownership of puppies or kittens without permission; prohibition from visits, without prior approval, to pet stores, toy stores, parks, malls, bike trails, skating rinks, and bowling alleys; prohibition from possession of toys or children's clothes or cameras; prohibition from hitchhiking, drinking, driving a car without permission, and using a cell phone with a camera. The SIST, therefore, is effectively a form of detention.

It also requires evaluation of available treatment options with the input of qualified professionals as to implementing an effective program of outpatient treatment and supervision. Consequently, article 10 contemplates imposition of SIST, if at all, following trial and the development of a fully litigated record on the nature and severity of a respondent's mental abnormality, and at a dispositional hearing where the Attorney General has the opportunity to object to recommendations. As a practical matter, then, SIST does not appear to be an available alternative prior to trial, and due process does not prohibit the Legislature from deferring a "lesser conditions" analysis until a record has been developed.

The Supreme Court has held that "identification of the specific dictates of due process generally requires consideration" of (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." (*Mathews v Eldridge*, 424 US 319, 335 [1976].)

In this case, the private interest is weighty. However, the risk of an erroneous deprivation of such interest is limited by the statutory requirement of two levels of review prior to commenc-

ing an article 10 petition, and by the statutory requirement of a judicial finding of probable cause to believe the respondent is a sex offender requiring civil management. The statute provides extensive procedural protections for respondents in connection with that probable cause determination. Once the Attorney General files a sex offender civil management petition, the court is required to "[p]romptly" appoint counsel (MHLS where possible) for a respondent who is financially unable to retain counsel. (Mental Hygiene Law § 10.06 [c].) Both the Attorney General and the respondent have the right to request a psychiatric evaluation by an examiner of their choice, and, if the respondent is financially unable to pay, the court will appoint an examiner to be paid within the limits prescribed by law. (Mental Hygiene Law § 10.06 [d], [e].) It also sets a time frame, although not strict time limits, contemplating a trial within 60 days, for resolution of the article 10 proceeding. (Mental Hygiene Law § 10.06 [k]; § 10.07 [a].)

█ The respondent's claim that the New York State Constitution mandates that mental health patients must be treated in the "least restrictive setting," and that article 10 is unconstitutional because it fails to do so, is without merit. The statute states clearly that sex offenders in need of civil management are a different population from traditional mental health patients. (Mental Hygiene Law § 10.01 [g].) As the court below specifically found, "mental abnormality" as used in the statute at issue has no medical validity. Rather, it is a legal term containing an inherent meaning of dangerousness. Thus, while article 10 aims to treat the sex offender, it was nevertheless primarily enacted to protect the community from high risk sex offenders and, as in other statutes designed for the protection of the community, to "remove the offender from the arena of possible action." (*Wayburn*, 39 NY2d at 689.)

█ Finally, we do not agree with the respondent that the issue of constitutionality as applied to him will be moot upon his dispositional hearing. The respondent's mootness argument is based on the view that once a disposition is made, this Court would no longer need to decide whether the Attorney General sustained his burden of establishing that lesser conditions than confinement would not suffice to protect the public in the respondent's case. However, the issue raised by the respondent's as-applied challenge—and determined here in the negative—is whether the Attorney General has that burden at all with regard to article 10 sex offenders. In that sense, it is a challenge the

Attorney General is certain to face again from sex offenders in the same category as the respondent, or those where the propriety of SIST is immediately apparent. Moreover, the temporary nature of pretrial detention makes it unlikely that the constitutional issue will be decided before a respondent's dispositional hearing. Hence, as an issue likely to arise in other cases, but likely to evade review, it meets the exception of mootness. (*See Matter of Hearst Corp. v Clyne*, 50 NY2d 707, 714-715 [1980]; *see also Schall*, 467 US at 256 n 3; *Matter of Miguel M. [Barron]*, 17 NY3d 37, 41 [2011].)

Accordingly, the order of the Supreme Court, Bronx County (Colleen D. Duffy, J.), entered on or about August 10, 2011, which, upon finding that the pretrial detention provisions of Mental Hygiene Law § 10.06 (k) are facially unconstitutional and ordered petitioner to immediately release respondent without supervision, should be reversed, on the law, without costs, the order for the respondent's unconditional release vacated, and the matter remanded for proceedings consistent with this decision and order.

TOM, J.P., DEGRASSE, RICHTER and MANZANET-DANIELS, JJ., concur.

Order, Supreme Court, Bronx County, entered on or about August 10, 2011, reversed, on the law, without costs, order directing respondent's unconditional release vacated, and the matter remanded for proceedings consistent with this decision and order.